# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2023-CA-01366-SCT

*IN THE MATTER OF THE ESTATE OF WILLIAM H. TATUM, JR., DECEASED: ZACHARY I. HAYNIE, EXECUTOR OF THE ESTATE OF BETSY GAY ROBERTS-TATUM*

*v.*

*THE ESTATE OF WILLIAM H. TATUM, JR., TATUM LAND & CATTLE, LLC, DARRELL TATUM, JOSEPH TATUM, PEOPLES' BANK OF RIPLEY, MISSISSIPPI, AND THE UNITED STATES OF AMERICA*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/17/2023 |
| TRIAL JUDGE: | HON. LAWRENCE LEE LITTLE |
| TRIAL COURT ATTORNEYS: | B. SEAN AKINS |
| | WALTER ALAN DAVIS |
| | ARCHIBALD BULLARD |
| | JOSEPH AARON SPEARMAN |
| | RICHARD SHANE McLAUGHLIN |
| | JOE M. DAVIS |
| | JOSEPH HARLAND WEBSTER |
| | SAMUEL DAVID WRIGHT |
| | D. KIRK THARP |
| COURT FROM WHICH APPEALED: | TIPPAH COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | WALTER ALAN DAVIS |
| | ARCHIBALD BULLARD |
| | REID KENDALL POSEY |
| ATTORNEY FOR APPELLEES: | B. SEAN AKINS |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS, AND ESTATES |
| DISPOSITION: | APPEAL DISMISSED AS MOOT - 05/22/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE COLEMAN, P.J., CHAMBERLIN AND GRIFFIS, JJ.**

**GRIFFIS, JUSTICE, FOR THE COURT:**

¶1. Zachary I. Haynie (Zach), executor of the Estate of Betsy Gay Roberts-Tatum, appeals various rulings by the chancellor, most of which center around the public sale of William H. Tatum Jr.'s one-half membership interest in Tatum Land and Cattle Company, LLC. Because a decision would be of no practical benefit to Zach, the appeal is dismissed as moot.

## FACTS AND PROCEDURAL HISTORY

¶2. Tatum Land and Cattle Company, LLC (TLCC), was created November 22, 2000, by Vernon Joseph Tatum (Joe). At the time of its creation, Joe was the sole member of TLCC. Joe adopted and executed an operating agreement on behalf of the company. The operating agreement was "binding upon . . . each of the members and their respective widows, heirs, executors, administrators and assigns." Under the operating agreement, "[i]f a member withdraws from [TLCC] by reason of death, then . . . the [company] or the members shall . . . purchase the interest of the deceased member . . . at the fair market value determined upon death[.]"

¶3. In 2003, Joe's father, William H. Tatum Jr. (William) was convicted of three counts of bank fraud, specifically two counts of aiding and abetting in creating false bank entries, reports, and transactions and one count of aiding and abetting in the laundering of monetary instruments. The United States of America obtained a $15,284,348 restitution judgment against William in federal court.

¶4. In 2012, the United States determined that based on his tax returns, William owned

2

a 50 percent membership interest in TLCC.[1]  The United States filed a charging order in June 2013 against William's one-half membership interest in TLCC.

¶5.    On October 9, 2013, with the consent of the United States, TLCC refinanced a preexisting loan and borrowed $454,271.44 from the Peoples Bank in Ripley (Peoples Bank). The promissory note was personally guaranteed by William and secured by a deed of trust for approximately 1,800 acres of real property owned by TLCC.  The United States agreed to subordinate its restitution judgment to allow Peoples Bank to secure its loan with the assets of TLCC.  Thereafter, the United States approved the sale of approximately 491 acres of real property owned by TLCC, with the sale proceeds paid toward the promissory note with Peoples Bank.

¶6.    William died on December 20, 2018, leaving his entire estate to his wife, Betsy Gay Roberts-Tatum (Gay).  At the time of his death, William's only asset was his one-half membership interest in TLCC.  At the time of William's death, TLCC owned approximately 1,300 acres of land.

¶7.    On January 10, 2019, an appraisal was conducted of the 1,300 acres of land owned by TLCC.  The appraised value of the property was $1,560,200.

¶8.    In February 2019, a petition to probate William's will was filed.  The chancellor admitted the will to probate and appointed Gay as executrix of William's estate.

¶9.    Three claims were probated against William's estate:

---

[1] It is unclear when William acquired his one-half membership interest in TLCC.

1. Peoples Bank in the amount of $225,380.35,

2. John Deere Financial in the amount of $2,002.49, and

3. The United States in the amount of $17,155,982.35.[2]

¶10. Regarding the probated claim filed by Peoples Bank, at the time the $225,380.35 claim was filed, only $180,147.49 remained due under the promissory note guaranteed by William. The remaining portion of the $225,380.35 claim was based on other loans to TLCC that were not personally guaranteed by William.

¶11. Gay died in June 2020. William's grandson and Joe's son, Darrell Tatum (Darrell), was appointed as successor executor to William's estate. Gay's son, Zach, was appointed executor of Gay's estate. Zach is Gay's sole heir and inherited her estate, including her rights to William's estate.

¶12. The parties negotiated for almost four years to resolve William's estate issues, but those negotiations ultimately failed. As a result, in May 2022, Darrell, as executor of William's estate, filed a "petition to appoint commissioner to sell personal property and for alternative relief." In the petition, Darrell asserted that it was in William's estate's best interest for the chancellor to order the public sale of William's one-half membership interest in TLCC.[3]

---

[2] The $17,155,982.35 included $14,099,546.30 principal and $3,056,436.05 interest.

[3] Peoples Bank joined the petition. Although TLCC, Joe, and the United States did not file a joinder to the petition, the transcript makes clear that they approved of the petition and the relief requested therein.

4

¶13.   Zach opposed the petition and filed a "counter petition to close estate and for distribution, alternatively, to enforce buyout provision of operating agreement and removal of successor executor."  In his counter petition, Zach requested that the chancellor close William's estate and distribute William's one-half membership interest in TLCC to Gay's estate so that the property owned by TLCC could be partitioned.  Alternatively, Zach requested that the chancellor enforce the operating agreement's buyout provision to purchase William's one-half membership interest in TLCC at fair market value.

¶14.   After a hearing on both petitions, the chancellor granted Darrell's petition and denied Zach's counter petition.  The chancellor appointed a special commissioner to sell William's one-half membership interest in TLCC.  The chancellor ordered TLCC to "provide the [s]pecial [c]ommissioner with any appraisal, financial statement, inventory, or other documents . . . necessary to market the [property]," and he ordered the special commissioner to "market the [property] by advertising or other means in order to maximize the return to the [e]state."

¶15.   The chancellor later ordered TLCC's counsel to "request from [TLCC]'s accountant such additional financial statements as may exist from 2019-present" and to "share any such documentation with the parties . . . and with [the] [s]pecial [c]ommissioner." The chancellor noted that TLCC "ha[d] waived its accountant-client privilege to allow any prospective purchasers . . . to speak with [TLCC's] accountant regarding the financial condition of [TLCC]."

¶16. Notice of the sale was published in the local newspaper. The notice advised that "[a]ny interested bidder may contact [the] [s]pecial [c]ommissioner and [the] [c]hancery [c]lerk . . . to receive further information concerning the financial condition of [TLCC], including but not limited to an itemization of the [c]ompany's assets and liabilities."

¶17. The public sale of William's one-half membership interest in TLCC was held on April 6, 2023. The highest bid for the property was from Joe in the amount of $675,000.

¶18. A hearing to confirm the public sale was held in May 2023. Zach objected to confirmation of the sale and, in support, offered two appraisals, both of which were performed after the sale had been conducted. The first appraisal valued the land owned by TLCC at $2,275,000. The second appraisal valued the land at $2,680,120 and improvements to the land at $486,000, for a total appraised value of $3,166,120. Zach claimed that Joe's bid of $675,000 was "wholly insufficient" for William's one-half membership interest and that it should be "rejected."

¶19. Over Zach's objection, the chancellor confirmed the public sale of William's one-half membership interest in TLCC. Joe was ordered to pay the bid amount to the special commissioner. The special commissioner was then ordered to transfer William's one-half membership interest to Joe and tender the sale proceeds to Darrell, as executor of William's estate.

¶20. Zach filed a motion for relief from judgment and argued that a membership interest in a limited liability company is not subject to judicial sale. Zach acknowledged that the

chancellor "has broad powers regarding the sale of personal property for the satisfaction of claims probated against an [e]state, generally," but he questioned the "enforcement vehicles . . . available to hold those assets chargeable." According to Zach, the exclusive remedy for creditors remained only the issuance of a charging order under Mississippi Code Section 79-29-705(2), (3) (Rev. 2024). Zach argued that by ordering the public sale of William's one-half membership interest in TLCC, the chancellor created "a new, equitable remedy to [William's] creditors" that is contrary to the law. Zach requested that the sale be set aside and that the operating agreement be enforced to require the purchase of William's one-half membership interest in TLCC at fair market value.

¶21.    Simultaneously with his motion for relief from judgment, Zach also filed a "motion for declaratory relief, assignment of note and deed of trust." In his motion, Zach sought to compel Peoples Bank to assign the promissory note and deed of trust to William's estate. Zach asserted that "if the probated claim of Peoples Bank is paid by [William's] estate under the guaranty agreement, [then] [William's] estate is entitled to an assignment of both the related [promissory] note and deed of trust."

¶22.    After a hearing, the chancellor denied both the motion for relief from judgment and the "motion for declaratory relief, assignment of note and deed of trust."

¶23.    Darrell petitioned to close William's estate and to discharge the executor. The petition listed the three probated claims against William's estate and noted that the "probated claims by the Peoples Bank . . . and John Deere Financial c[ould] be fully satisfied from the

assets of [William's] [e]state." The petition also noted that the United States "agreed, upon condition that no other [e]state assets are marshaled, to accept $400,983 as full satisfaction of the probated claim."

¶24. The chancellor granted the petition, closed the estate, and discharged the executor. The order stated in relevant part as follows:

> 4. The following claims were probated against [William's] [e]state:
>
>> a. [Peoples Bank] in the amount of $225,380.35, with the balance owed by the [e]state being $191,964.38 (as of November 16, 2023, with interest accruing daily thereafter at $23.96 per day).
>>
>> b. John Deere Financial in the amount of $2,002.49; and
>>
>> c. The [United States] in the amount of $17,155,982.35.
>
> 5. The probated claims by [Peoples Bank] and John Deere Financial shall be fully satisfied from the assets of [William's] [e]state.
>
> 6. That the [United States] has agreed, upon condition that no other [e]state assets are marshaled, to accept $400,983 as full satisfaction of the probated claim. This sum shall be paid to the [United States] from the assets of [William's] [e]state.
>
> 7. The sum of $50,000 is exempt from claims of creditors pursuant to Miss. Code Ann. § 85-3-l(h) and shall be distributed to [Gay's] [e]state . . . .
>
> 8. Further, a widow's allowance in the sum of $24,000 shall be paid to [Gay's] [e]state . . . .
>
> 12. The Executor is authorized to distribute the assets of and close this estate as set out herein and in the Will admitted to probate. This shall include an assignment of any and all rights which may arise from the payment of the Peoples Bank promissory note by [William's] [e]state and the Executor shall execute any instrument necessary to assign same.

13.  After costs, fees and expenses are fully paid, the Executor and Counsel for the Executor stand finally discharged in the premises and the estate of William H. Tatum, Jr. shall be closed without the entry of any other or further orders or decrees in this cause.

¶25.    Darrell satisfied the probated claims from the assets of William's estate.  All creditors were paid, and Zach received $74,000.  Peoples Bank released its probated claim against William's estate, released its lien on TLCC's property, and released the deed of trust.  Approximately one month later, Zach filed his notice of appeal.  The United States and John Deere Financial then released their probated claims against William's estate.

¶26.    On appeal, Zach argues (1) the chancellor erred by failing to order indemnity of payment and assignment of creditor's rights when approving payment of the probated claim based upon the personal guaranty by William, (2) the chancellor erred by not enforcing the operating agreement and its mandatory requirement to purchase William's one-half membership interest in TLCC for fair market value, (3) the chancellor erred by ordering the public sale of William's one-half membership interest in TLCC, (4) there were irregularities regarding the sale that rendered the sale inequitable, and (5) the bid accepted and approved by the chancellor should be set aside as the bid price was so inadequate as to shock the conscience of the court.

## STANDARD OF REVIEW

¶27.    "We employ a limited standard of review when reviewing the decision of a chancellor."  ***Creely v. Hosemann***, 910 So. 2d 512, 516 (Miss. 2005) (citing ***McNeil v.***

9

*Hester*, 753 So. 2d 1057, 1063 (Miss. 2000)). "The findings of a chancellor will not be disturbed on review unless the chancellor was manifestly wrong, clearly erroneous, or applied the wrong legal standard." *Id.* (internal quotation marks omitted) (quoting *McNeil*, 753 So. 2d at 1063). "The standard of review employed by this Court for review of a chancellor's decision is abuse of discretion" *Id.* (internal quotation marks omitted) (quoting *McNeil*, 753 So. 2d at 1063). "However, for questions of law, the standard of review is de novo." *Id.* (internal quotation marks omitted) (quoting *McNeil*, 753 So. 2d at 1063).

## DISCUSSION

¶28. In response to Zach's appeal, Darrell, as executor of William's estate, TLCC, and Joe[4] assert that "there is no scenario where [Zach] can receive any relief such that his claims are moot." This Court agrees and finds that Zach's claims are moot.

¶29. "Cases in which an actual controversy existed at trial but the controversy has expired at the time of review, become moot." *Barrett v. City of Gulfport*, 196 So. 3d 905, 910-11 (Miss. 2016) (internal quotation marks omitted) (quoting *Allred v. Webb*, 641 So. 2d 1218, 1220 (Miss. 1994)). "[A] case is moot so long as a judgment on the merits, if rendered, would be of no practical benefit to the plaintiff or detriment to the defendant." *Id.* (alteration in original) (internal quotation marks omitted) (quoting *Gartrell v. Gartrell*, 936 So. 2d 915, 916 (Miss. 2006)).

---

[4] Although Peoples Bank and the United States were interested parties in the trial court, they are no longer interested parties to the litigation on appeal since they have both released their probated claims against William's estate.

¶30. "This Court will not adjudicate moot questions." *Id.* (citing *City of Madison v. Bryan*, 763 So. 2d 162, (Miss. 2000)). "In general, we will dismiss an appeal 'when no useful purpose could be accomplished by entertaining it, when so far as concerns any practical ends to be served the decision upon the legal questions involved would be merely academic.'" *Koestler v. Koestler*, 976 So. 2d 372, 379 (Miss. Ct. App. 2008) (quoting *Strong v. Bostick*, 420 So. 2d 1356, 1359 (Miss. 1982)).

¶31. Zack argues that the chancellor erred by denying his "motion for declaratory relief, assignment of note and deed of trust." Zack asserts that "[p]revailing on [the] motion would have given [William's] [e]state the right to collect indemnity of the amount paid on the personal guaranty claim of Peoples Bank . . . from [TLCC,] the underlying debtor on the promissory note." Zack admits that any additional funds collected from TLCC as a result of an assignment of the promissory note and deed of trust from Peoples Bank would inure to his benefit since he is now the sole beneficiary of William's estate. But even if William's estate had collected additional funds based on the assignment of the note and deed of trust, those funds would have been given to the United States as payment toward the $17 million restitution judgment.[5]

---

[5] Additionally, Peoples Bank was paid in full and released its claim against William's estate. Zack did not ask for a stay of execution. As a result, the deed of trust was released. TLCC's assets, i.e., 1,300 acres of land, were later conveyed to the Bank of Holly Springs as security for the loan to purchase William's one-half membership interest in TLCC. Consequently, Peoples Bank no longer has the promissory note and deed of trust to assign.

¶32.   The remainder of Zach's arguments involve the public sale of William's one-half membership interest in TLCC.  Specifically, Zach asserts (1) the chancellor erred by not enforcing the operating agreement and its mandatory requirement that William's one-half membership interest in TLCC be purchased at fair market value, (2) the chancellor erred by ordering the public sale of William's one-half membership interest in TLCC, (3) irregularities regarding the sale rendered the sale inequitable, and (4) the bid accepted and approved by the chancellor should be set aside as inadequate.  But even if we were to set aside the sale and order the chancellor to litigate fair market value, as Zach suggests, any additional funds would go to the United States.

¶33.   Zach disagrees, stating, "it is simply not the case that any additional funds recovered by [William's] [e]state would have to be paid to the [United States]."  Zach claims that the United States "made a fixed agreement to accept [$400,983]" and that "[n]o conditions or contingencies were placed upon this agreement."

¶34.   The record, however, makes clear that the United States' $400,983 settlement offer was not "fixed" but was instead "contingent on the numbers being as they are now."  In other words, the United States agreed to accept $400,983 "upon [the] condition that no other [e]state assets [we]re marshaled."  In fact, the United States specifically stated that if significantly more property was shown, it would reevaluate its offer.  And despite his assertions on appeal, Zach acknowledged on at least one occasion in the trial court that the United States' $400,983 offer was "a tentative agreement," and he agreed that if additional

12

money was discovered or received, the United States would want it. Thus, even if additional funds were recovered, either by an assignment of the note and deed of trust or by a determination of fair market value, those funds would go to the United States, not Zach.[6]

**CONCLUSION**

¶35. The record reflects that the United States will receive any additional funds over and above what Zach has already received. As a result, if a decision was rendered, it "would be of no practical benefit to [Zach][.]" *Barrett*, 196 So. 3d at 911 (quoting *Gartrell*, 936 So. 2d at 916). Consequently, the appeal is dismissed as moot.

¶36. **APPEAL DISMISSED AS MOOT.**

**RANDOLPH, C.J., KING AND COLEMAN, P.JJ., MAXWELL, CHAMBERLIN, ISHEE, SULLIVAN AND BRANNING, JJ., CONCUR.**

---

[6] At the hearing on the petition to sell personal property, the United States asserted that the estate exemptions would not apply to its probated claim. In other words, the United States argued that Zach was not entitled to the estate exemptions, i.e., the $50,000 and the $24,000. While Zach ultimately received the exemptions, as ordered by the chancellor, the United States' argument shows that it would have sought and requested any additional money collected by William's estate. As counsel for the United States stated, the money is "not coming to the government, it's coming through the government to a victim that still exists because of [William]'s crimes."